## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs | ) | Case No. CR-05-71-M |
| | ) | |
| ARNOLD CAMPER MARQUEZ, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

Pending before the Court is Defendant Arnold Camper Marquez's Motion to Suppress Evidence Obtained as a Result of an Illegal Search and Seizure. The Motion has been fully briefed; in addition, an evidentiary hearing was held on May 31, 2005, during which District Nine Drug Task Force ("District Nine") Agent John Stanbery, Drug Enforcement Agency Task Force Officer ("TFO") Brett Wellden, Stillwater Police Officer Royce Stephens, and District Nine Agent Jeremy Ronspiez testified.[1] Based upon the parties' written submissions, the argument of counsel, and the evidence presented during the hearing, the Court finds that Marquez's Motion should be denied.

I.    Factual Background

On March 19, 2005, District Nine agents and other law enforcement officers working with District Nine were monitoring a "ruse" drug checkpoint on northbound I-35 near Exit 170 (the "Mulhall exit"). The checkpoint consisted of two signs facing northbound traffic on I-35 and an unmanned police cruiser. The first sign was placed approximately three-quarters of a mile south of the Mulhall exit, and warned drivers in English and Spanish that a narcotics check point was one-mile ahead. The second sign was placed just south of the Mulhall exit, and warned drivers in

---

[1]    The Court finds that Agent Stanbery, TFO Wellden, Officer Stephens, and Agent Ronspiez are credible witnesses.

English and Spanish that the checkpoint was one-half mile ahead.  The unmanned police cruiser was situated approximately one-half mile north of the Mulhall exit with its overhead lights activated, and was clearly visible to northbound drivers as they passed the two checkpoint signs.

There was, of course, no drug checkpoint after the Mulhall exit.  The real checkpoint was located just off the Mulhall exit, where several District Nine agents and other law enforcement officers sitting in marked and unmarked vehicles in a church parking lot watched and then followed the cars that exited at Mulhall.  Based on the location of the signs and the unmanned police cruiser, the Mulhall exit was the only exit that could have been used to avoid the ruse checkpoint.  Mulhall, however, is a small, rural community with few, if any, places of public accommodation.  As a result, the Mulhall exit is rarely used by drivers, with the exception of Mulhall's residents and visitors.  Any vehicle exiting at Mulhall, therefore, was considered suspicious from the outset.

At approximately 9:00 p.m., Agent Stanbery and TFO Wellden, both of whom were seated in Agent Stanbery's unmarked sport utility vehicle ("SUV") observing northbound traffic on I-35, noticed a dark-colored SUV exit at Mulhall.  Agent Stanbery followed the vehicle, which turned westbound on Mulhall Road, toward the Town of Mulhall.[2]   Shortly after the SUV turned onto Mulhall Road, Agent Stanbery and TFO Wellden observed the vehicle move "left of center" of the roadway with all four tires.  Noting that this maneuver constituted a traffic violation, and specifically a violation of Okla. Stat. tit. 47, § 11-301(A), Agent Stanbery initiated a routine traffic stop approximately one mile west of the Mulhall exit.

---

[2]      TFO Wellden testified that eastbound Mulhall Road turns into a dirt road, and possibly a dead-end, approximately 50-75 yards after the Mulhall exit.

2

Agent Stanbery approached the driver of the vehicle, who turned out to be Defendant Arnold Camper Marquez, explained the reason for the traffic stop, made routine inquiries regarding Marquez's travel plans, and asked to see Marquez's driver's license and vehicle registration.  During the conversation, Agent Stanbery noted that Marquez appeared extremely nervous: he faced forward throughout, avoiding eye contact with the agent, his hands were trembling, and he was sweating despite the fact that it was a cool night.  In response to a question about his travel plans, Marquez stated that he was traveling from Los Angeles, California to Stillwater, Oklahoma, where his passenger, Patricia Moore, resides.  When asked why he was traveling westbound on a rural road, in the opposite direction of Stillwater, Marquez explained that he was looking for a motel.  Agent Stanbery found this explanation suspect given that Marquez was only 25 miles from Stillwater at the time, and that the nearest motel was several miles away in the opposite direction.

After this exchange, Agent Stanbery examined Marquez's driver's license, only then realizing that the person he stopped was the subject of a conversation he had been having with TFO Wellden only minutes earlier.  Apparently, Marquez was being investigated by the DEA for trafficking in methamphetamine in the Stillwater, Oklahoma area.  Agent Stanbery and TFO Wellden were discussing that investigation when they observed Marquez's vehicle exit at Mulhall.

Agent Stanbery advised TFO Wellden of the identity of the driver before requesting additional units, including a canine unit, and running a driver's license, warrant, and criminal history check on Marquez.  According to Agent Stanbery, this occurred approximately 2-3 minutes into the traffic stop.  Before Agent Stanbery finished calling in the background checks, and approximately 1-2 minutes after his presence was requested, Officer Stephens, who was among the District Nine officers in the church parking lot, arrived at the scene with his drug-sniffing dog Maico.  When

Agent Stanbery finished calling in the background checks, but before the information had come back, he asked Officer Stephens to conduct a "free-air sniff" of the vehicle.  Officer Stephens, in turn, asked Agent Stanbery to remove the occupants for safety purposes.  Marquez and Moore were then asked to, and did, exit the vehicle.

Within approximately 1 minute of initiating the free-air sniff, which Officer Stephens and Maico began at the front, driver's side of the SUV, proceeding in a counter-clockwise direction around the vehicle, Maico alerted to the presence of narcotics.  Maico alerted in the area of the rear wheel well on the driver's side of the vehicle.   At that point, Officer Stephens informed Agent Stanbery of Maico's alert.  Despite the alert, Officer Stephens and Maico continued around the vehicle, and Maico again alerted to the presence of drugs in the area of the passenger door, which Moore had left standing open.[3]  Once Maico alerted to the presence of narcotics, Marquez and Moore were handcuffed and, according to Agent Stanbery, placed in "investigative detention." District Nine agents testified that approximately 5 minutes passed between the time the traffic stop was initiated and the time that Maico alerted to the presence of narcotics.  The information requested by Agent Stanbery via the background checks had not yet been received by the time of Maico's alert.

The agents then prepared to search the SUV, but decided to return to the church parking lot to do so.  Agent Stanbery and TFO Wellden testified that this decision was based on considerations of convenience and safety: the SUV was tightly packed, and the location of the traffic stop afforded little room to remove and examine all of the contents of the SUV; in addition, the stop occurred on

_____

[3]      The driver's side door was closed during the free-air sniff.

4

the crest of a hill, and it would have been difficult for westbound traffic on Mulhall Road to observe the parked vehicles in sufficient time to avoid them.

While Marquez was being transported from the traffic stop to the parking lot by District Nine Agent Ronspiez, Marquez spontaneously informed the agent that a loaded gun and drugs would be found in the vehicle. Agent Ronspiez relayed Marquez's statement to Agent Stanbery before the search was commenced.

As expected, the search revealed controlled substances and weapons. Among the items discovered were: plastic baggies containing what was field-tested positive to be crystal methamphetamine, plastic baggies containing marijuana, a loaded handgun, and drug paraphernalia, including digital scales and more plastic baggies. Upon discovering the drugs, the agents placed Marquez and Moore under arrest.

On April 12, 2005, a federal grand jury indicted Marquez on charges of: (1) conspiracy to possess with intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, and an unidentified quantity of marijuana, a Schedule I controlled substance, all in violation of 21 U.S.C. §§ 841(a)(1), 846; (2) possession with intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine and an unidentified quantity of marijuana in violation of 21 U.S.C. § 841(a)(1); (3) engaging in interstate travel with the intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of an unlawful activity, namely, a business enterprise involving drug trafficking, all in violation of 18 U.S.C. § 1952(a)(3); and (4) possession of a firearm during the commission of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i).

Marquez moves the Court to suppress all evidence seized during, together with all statements and evidence that flowed from, the alleged unlawful search of his vehicle.  In his Motion, Marquez generally points out that the government bears the burden of establishing the propriety of the warrantless search at issue in this case.  The substance of his Motion, however, is limited to the following paragraph:

> It appears from the discovery materials received from the government, that there are no justifiable exceptions to the warrantless search of Mr. Marquez's vehicle and items located inside the vehicle. Mr. Marquez did not give consent to search his vehicle.  There was no probable cause to search the vehicle.  Mr. Marquez was not under arrest and should have been free to go after the initial traffic citation. There were no exigent circumstances.  There was not an alleged inventory search of the vehicle.

Mot. to Suppress at 3.

II.    Discussion

The search and seizure at issue in this case can be analyzed in three parts: (1) the propriety of the initial traffic stop; (2) the scope of Marquez's detention during the traffic stop; and (3) the propriety of the free-air sniff and the scope of Marquez's detention following the drug-sniffing dog's alert to the presence of controlled substances.

A.    Propriety of Traffic Stop

The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures by the government.  U.S. Const. amend. IV; *United States v. Williams*, 403 F.3d 1203, 1206 (10th Cir. 2005).  It is well established that the protections of the Fourth Amendment "extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *Williams*, 403 F.3d at 1206.  Routine traffic stops constitute "investigative detentions" and are analyzed under the

two-part test announced by the United States Supreme Court in *Terry v. Ohio*, 392 U.S. 1, 19-20 (1968). *Id.*

Under *Terry*, the Court must first determine whether the stop was "justified at its inception." *Id.* "[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995) (en banc); *see also Wren v. United States*, 517 U.S. 806, 810 (1996) ("As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."). The fact that the officer may have had some other subjective motivation for conducting the stop is irrelevant. *United States v. Hunnicutt*, 135 F.3d 1345, 1348 (10th Cir. 1998). In this case, Agent Stanbery and TFO Wellden testified that all four wheels of Marquez's SUV crossed left of center of the roadway in violation of Okla. Stat. tit. 47, § 11-301(A).[4] Clearly, Marquez's violation was sufficient under the Fourth Amendment to justify the initial traffic stop of his vehicle.

B.    Scope of Detention

Second, the Court must determine "whether the officer's conduct during the detention was reasonably related in scope to the circumstances which justified the initial stop." *Williams*, 403 F.3d at 1206. Ordinarily, a law enforcement officer conducting a traffic stop may check the driver's license and vehicle registration, run a computer check for warrants or registration, and issue a citation. *Hunnicutt*, 135 F.3d at 1349. He may also inquire as to the driver's travel plans. *United*

---

[4]     That statute provides that "[u]pon all roadways of sufficient width a vehicle shall be driven upon the right half of the roadway, except in [limited circumstances]." Okla. Stat. tit. 47, § 11-301(A).

*States v. Holt*, 264 F.3d 1215, 1221 (10th Cir. 2001) (en banc) (per curiam).  However, "[t]he investigative detention usually must 'last no longer than is necessary to effectuate the purpose of the stop,' and '[t]he scope of the detention must be carefully tailored to its underlying justification.'" *Hunnicutt*, 135 F.3d at 1349 (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)).

In the context of a traffic stop, an "extended" investigative detention is justified in two circumstances.  "First, the officer may detain the driver for questioning unrelated to the initial stop if he has an objectively reasonable and articulable suspicion illegal activity has occurred or is occurring. . . . Second, further questioning unrelated to the initial stop is permissible if the initial detention has become a consensual encounter." *Id.*

To determine whether an officer had "objectively reasonable and articulable suspicion illegal activity has occurred or is occurring," the court must consider the totality of the circumstances. *Williams*, 403 F.3d at 1207.  Moreover, the court "should accord deference to an officer's ability to distinguish between innocent and suspicious actions." *Id.*  Among the factors the court may consider in making its reasonableness determination are: "having no proof of ownership of the vehicle, having no proof of authority to operate the vehicle, and inconsistent statements about destination." *Hunnicutt*, 135 F.3d at 1349.  Other factors the court may consider include: "[e]xtreme and continued nervousness,"[5] *United States v. Williams*, 271 F.3d 1262, 1268 (10th Cir. 2001); *United States v. Klinginsmith*, 25 F.3d 1507, 1510 n.1 (10th Cir. 1994), the fact that the driver "took an exit which was the first exit after a narcotics check lane sign, and an exit that was seldom used,"

---

[5]     While "extreme and continued nervousness" may justify a finding that reasonable and articulable suspicion exists, *Williams*, 271 F.3d at 1268, the Tenth Circuit has made clear that ordinary nervousness "is 'of limited significance' in determining whether reasonable suspicion exists," *id.*, and that "[n]ervousness alone cannot support reasonable suspicion of criminal activity." *Id.* at 1269 (quoting *United States v. Salzano*, 158 F.3d 1107, 1113 (10th Cir. 1998)).

*Klinginsmith*, 25 F.3d at 1510 n.1, and questionable travel plans.  *Id.* (affirming district court conclusion that reasonable suspicion of criminal activity existed where, among other things, "the driver of the car indicated that [he and his passengers] were looking for a gas station, when they had just passed several gas stations on the highway").

In this case, the evidence presented indicates that Agent Stanbery conducted a very routine traffic stop, checking Marquez's license and vehicle registration, running background checks to determine, for example, if Marquez had any outstanding warrants, and asking about Marquez's travel plans.  The Court finds that all of these inquiries are permissible under the Fourth Amendment; they do not establish or otherwise give rise to an inference that the scope of an ordinary traffic stop was in any way exceeded.  *See Hunnicutt*, 135 F.3d at 1349; *Holt*, 264 F.3d at 1221.  In addition, the traffic stop was short in duration, totaling approximately five minutes from the time the stop was initiated until the drug-dog's alert to the presence of narcotics.  The Court finds that the scope of Marquez's detention was permissible under the Fourth Amendment.

Assuming, for the sake of argument, that the permissible scope of Marquez's detention was exceeded by the nature of Agent Stanbery's questioning or the length of the detention, the Court nevertheless finds that Agent Stanbery had reasonable and articulable suspicion that illegal activity had occurred or was occurring, and that an extended investigative detention was warranted.  Agent Stanbery testified that Marquez acted suspiciously nervous when confronted, that he looked straight ahead to avoid eye contact, and was sweating and visibly trembling; he also testified that Marquez's travel plans were questionable, particularly with respect to his search for a motel in a westbound direction on a rural and rarely used road when Stillwater, his alleged destination, was approximately 25 miles away in the other direction; and he further testified that Marquez exited the highway onto

9

a seldom-used road immediately after a posted sign for a drug checkpoint.  Finally, and perhaps most importantly, after examining Marquez's driver's license, Agent Stanbery correctly identified Marquez as the subject of an ongoing but unrelated federal drug trafficking investigation.  Under the totality of the circumstances, the Court finds this evidence is sufficient to withstand constitutional scrutiny.  *Williams*, 271 F.3d at 1268; *Klinginsmith*, 25 F.3d at 1510 n.1.

  C.  Drug-Sniffing Dog

  In *Illinois v. Caballes*, the United States Supreme Court recently declared that "[a] dog sniff conducted *during* a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment." 125 S. Ct. 834, 838 (2005) (emphasis added); *see also Hunnicutt*, 135 F.3d at 1350 ("A canine sniff itself does not implicate Fourth Amendment rights because of the limited information it provides and its minimal intrusiveness.").  The evidence presented during the hearing indicates that Maico was brought to the scene of the traffic stop *during* the ordinary course of the stop, *before* Agent Stanbery finished calling in his background checks.  The evidence also establishes that Maico alerted to the presence of narcotics within approximately one minute of arriving on the scene, and again, before the information requested through the background checks had been received by Agent Stanbery.  Under *Caballes*, the use of the drug-sniffing dog under these circumstances was proper.

  The Court finds that no constitutional question arises from the fact that Marquez and Moore were asked to exit the SUV during the free-air sniff.  In *Holt*, the Tenth Circuit held that "[a]n officer . . . may order the driver and passengers out of the vehicle in the interest of officer safety, even in the absence of any particularized suspicion of personal danger." 264 F.3d at 1222.  Agent Stanbery

and Officer Stephens testified that Marquez and Moore were asked to step out of the vehicle for safety reasons.  Under *Holt*, this procedure is permissible.

Until Officer Stephens conducted the free-air sniff on Marquez's vehicle, the traffic stop was still in the nature of an investigative detention – as discussed above, none of Agent Stanbery's inquiries or the procedures that he employed in executing the traffic stop are constitutionally questionable, nor did they transform the investigative detention into something more.  Maico's alert to the presence of controlled substances, however, changed the nature of the encounter.

The Tenth Circuit has consistently held that "when a dog alerts to a vehicle, probable cause arises allowing a search of the vehicle, including the trunk, without a warrant."  *United States v. Rosborough*, 366 F.3d 1145, 1152 (10th Cir. 2004) (citing *Klinginsmith*, 25 F.3d at 1510).  The warrantless vehicle search in this case, which followed a drug dog's alert to Marquez's vehicle, was therefore constitutionally permissible.  Marquez's continued detention during the search was likewise permissible, as the officers had at that point established probable cause for the search, and shortly thereafter for Marquez's arrest on drug charges.

III.    Conclusion

In summary, and as set forth in detail above, the Court finds that: (1) the initial traffic stop of Marquez's vehicle was proper, as the officers conducting the stop had probable cause to believe that Marquez committed a traffic violation, namely, a violation of Okla. Stat. tit. 47, § 11-301(A); (2) that the scope of Marquez's detention was not excessive, as the questions asked of Marquez and the actions of Agent Stanbery (e.g., license, vehicle registration, criminal history, and warrant checks and inquiring as to Marquez's travel plans) were reasonable and routine; (3) that even assuming the scope of Marquez's detention was in any way excessive, the extended nature of his

detention was supported by reasonable and articulable suspicion that illegal activity was occurring; (4) that the use of a drug-sniffing dog outside of Marquez's vehicle was constitutionally permissible; and (5) that the warrantless search of Marquez's vehicle following the drug-dog's alert was supported by probable cause. For all of the foregoing reasons, the Court hereby DENIES Marquez's Motion to Suppress Evidence Obtained as a Result of an Illegal Search and Seizure [docket no. 9].

**IT IS SO ORDERED this 1st day of June, 2005.**

VICKI MILES-LaGRANGE
UNITED STATES DISTRICT JUDGE